## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

ANTHONY MARTIN,

    Plaintiff,

v.                         CASE NO.: _____

THE FLORIDA DEPARTMENT OF
CORRECTIONS, an agency of the
State of Florida,

THE FLORIDA DEPARTMENT OF
MANAGEMENT SERVICES, an
agency of the State of Florida,

THE GEO GROUP, INC., a Florida
corporation, and

WELLPATH LLC, an out-of-state
limited liability company registered
and doing business in Florida,

    Defendants.

_____/

## <u>COMPLAINT</u>

    Plaintiff, Anthony Martin, by and through the undersigned counsel, hereby sues the Florida Department of Corrections ("FDC"), the Florida Department of Management Services ("DMS"), The GEO Group, Inc. ("Geo Group"), and Wellpath LLC ("Wellpath") (collectively, the "Defendants"), and alleges as follows:

## INTRODUCTION

1.      This is a civil rights action for monetary damages. Plaintiff is an inmate incarcerated in Defendant FDC's prison system. Plaintiff is suing Defendants for deliberating depriving him of medically necessary treatment for hepatitis C. Specifically, Plaintiff sues Defendants FDC and DMS for discriminating against him on the basis of disability in violation of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act ("RA") and Defendants Geo Group and Wellpath for their deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment to the United States Constitution.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 in that this is a civil rights action arising under the Constitution of the United States.

3.      Venue is proper in the Northern District of Florida, Tallahassee Division, as Defendant FDC is headquartered with its principal place of business in Tallahassee, Florida, and a substantial part of the events or omissions giving rise to Plaintiffs claims occurred in the Northern District of Florida. *See* 28 U.S.C. § 1391.

4.      The claims alleged herein are brought within the applicable statute of limitations.

5.     Plaintiff has complied with all conditions precedent and has fully and properly exhausted all administrative remedies prior to filing this action. Alternatively, Plaintiff alleges that administrative remedies were unavailable to him and therefore need not be exhausted prior to filing suit.

## THE PARTIES

6.     Plaintiff is an inmate incarcerated in Defendant FDC's prison system. He has been incarcerated since May 4, 2009. Throughout his incarceration, Plaintiff has been housed at multiple state and private correctional facilities, including but not limited to, Reception and Medical Center ("RMC"), Santa Rosa Correctional Institution ("Santa Rosa CI"), Blackwater River Correctional Facility ("Blackwater CF"), and Okaloosa Correctional Institution ("Okaloosa CI"). Plaintiff was denied medically necessary treatment for HCV at every prison he was housed.

7.     Defendant FDC is an agency of the State of Florida that owns and operates correctional facilities throughout the State, including RMC, Santa Rosa CI, and Okaloosa CI, and receives federal funds to operate its agency. Defendant FDC is headquartered in Tallahassee, Florida. Defendant FDC is responsible for the healthcare services provided to all inmates confined in its prison system, including the healthcare services for Plaintiff and all inmates incarcerated in private correctional facilities. Defendant FDC discriminated against Plaintiff—a qualified

individual with a disability due to his infection with chronic HCV—by deliberately failing to provide Plaintiff medically necessary treatment for his chronic HCV.

8.     Defendant DMS is an agency of the State of Florida that has contracted with Defendant Geo Group for the operations and management of private prisons in Florida, including but not limited to, Blackwater CF. Defendant DMS is charged with managing the contracts between Geo Group and the State of Florida, and receives federal funds to operate its agency. DMS discriminated against Plaintiff— a qualified individual with a disability due to his infection with chronic HCV—by deliberately failing to request, procure, and/or provide funding to Geo Group for purposes of providing Plaintiff medically necessary treatment for his chronic HCV.

9.     Defendant Geo Group is a Florida corporation and private prison owner and operator. Defendant Geo Group operates correctional facilities in Florida pursuant to a contact with the State. Defendant Geo Group owns and operates Blackwater CF, where Plaintiff was housed and denied treatment for his HCV from approximately December 2014 to February 2018.

10.     Defendant Wellpath is an out-of-state limited liability company, registered and doing business in Florida. Defendant Wellpath provides healthcare services to inmates housed in privately-operated facilities, including Blackwater CF, where Plaintiff was housed and denied treatment for his HCV.

11.     The actions, inactions, and omissions of the Defendants as alleged herein were performed under color of state law and constitute state action.

12.     At all times relevant hereto, Defendant FDC had a non-delegable duty to provide constitutionally adequate medical care to all prisoners in its custody. *See Ancata v. Prison Health Servs.*, 769 F.2d 700, 705 (11th Cir. 1985); *West v. Atkins*, 487 U.S. 42, 56 (1988).

## FACTS

### Background Information on Hepatitis C

13.     Hepatitis C is a blood borne disease caused by the hepatitis C virus ("HCV"). The virus causes inflammation that damages liver cells and is a leading cause of liver disease and liver transplants.

14.     HCV can be either acute or chronic. In people with acute HCV, the virus will spontaneously clear itself from the blood stream within six months of exposure. Chronic HCV, on the other hand, is defined as having a detectable HCV viral level in the blood at some point six months after exposure. Fifty (50) to eighty (80) percent of infected people will develop chronic HCV.

15.     Liver inflammation caused by chronic HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, fighting infection, and conducting other metabolic processes in the body.

Liver inflammation can also cause fatigue, weakness, muscle wasting, skin rashes, and arthritis.

16.     People with chronic HCV develop fibrosis of the liver, a process by which healthy liver tissue is replaced with scarring. When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis. Scar tissue cannot perform the job of normal liver cells, so fibrosis reduces liver function and results in the same symptoms mentioned above, but with greater intensity. Fibrosis can also lead to liver failure and hepatocellular carcinoma (liver cancer).

17.     The amount of liver scarring a patient has is usually measured on the METAVIR scale. On this scale, a person can be classified F0 (no fibrosis), F1 (mild fibrosis), F2 (moderate fibrosis), F3 (severe fibrosis), or F4 (cirrhosis).

18.     Among those with chronic HCV, the majority will develop progression liver disease and approximately 20% will develop cirrhosis in a 20-year timeframe. Patients with rapid fibrosis liver progression may reach cirrhosis within as short a timeframe as one year.

19.     Cirrhosis causes additional painful complications, including widespread itching, kidney disease, jaundice, fluid retention with edema, internal bleeding, varices (enlarged veins that develop in the esophagus or intestines, which can burst), easy bruising, ascites (fluid accumulation in the legs and abdomen), encephalopathy (mental confusion and disorientation), lymph disorders, increased

risk of infection, seizures, and extreme fatigue. Most of these complications can occur before cirrhosis. If they go untreated, some can cause death, often from infection, bleeding, and fluid accumulation.

20.     Abdominal ascites can require paracentesis, a procedure wherein a needle is inserted into the abdomen to drain the fluid. Without this periodic procedure, the fluid accumulation can decrease the available space for the patient's lungs, thus causing shortness of breath and difficulty breathing.

21.     Moreover, once an HCV patient's liver has cirrhosis, it may not be reversible. Some patients with cirrhosis may have too much scar tissue in the liver, even if the liver can heal to some degree once the virus is eliminated by treatment. If scar tissue persists, the patient may still experience the complications of cirrhosis, including liver cancer.

22.     Chronic HCV is, as a matter of law, a serious medical need. *See Mitchell v. Nobles*, 878 F.3d 869, 876 (11th Cir. 2017).

23.     Plaintiff's disabling condition was chronic HCV. In other words, Plaintiff's "disability" was chronic HCV for purposes of the ADA and RA.

## **General Prevalence of HCV**

24.     Approximately 2.7 to 3.9 million Americans have chronic HCV.

25.    In 2000, the United States Surgeon General called HCV a "silent epidemic," and estimated that as much as two percent of the adult U.S. population had HCV.

26.    In 2013, HCV caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

27.    Approximately 19,000 people die of HCV-caused liver disease every year in the United States.

28.    HCV is the leading indication for liver transplants in the United States.

## HCV in Prison

29.    The prevalence of HCV in prison is much higher than in the general population. It is estimated that between 16% and 41% of the United States' jail and prison population has HCV. Thus, incarceration is a risk factor for HCV.

30.    Defendant FDC has reported to the media and researchers that 5,000 to 5,272 of its approximately 98,000 inmates have HCV. As of August 8, 2016, Defendant FDC listed 4,797 inmates as having HCV in its internal records. As of late-2017, it was estimated that FDC had knowledge of at least 7,000 inmates who were infected with HCV.

31.    In fact, because it is estimated that between 16% and 41% of incarcerated people have HCV, it is likely that between 14,700 and 40,184 FDC inmates have HCV. The true number is likely at the higher end of that spectrum

because of the high prevalence of HCV in Florida: Between 2009 and 2013, rates of acute HCV in Florida increased by 133%.

## Treatment of HCV

32.    For many years, there were no universally safe and effective treatments for HCV. The standard treatment prior to 2011, which included the use of interferon and ribavirin medications and sometimes required injections, had a long treatment duration (up to 48 weeks), failed to cure most patients, and was associated with numerous side effects, including psychiatric and autoimmune disorders, flulike symptoms, gastrointestinal distress, skin rashes, and severe anemia. Moreover, not all drug regimens worked for all types of HCV, and many could not be given to patients with other comorbid diseases.

33.    In 2011, however, the Food and Drug Administration ("FDA") began approving new oral medications, called direct-acting antiviral ("DAA") drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively. At first, they were designed to work in tandem with the old treatment regimen. But beginning in 2013, the FDA began to approve DAA drugs that can be taken alone.

34.    As of late-2013, DAA drugs became available for HCV patients.

35.    These DAA drugs have far fewer side effects, dramatically greater efficacy, a shorter treatment duration (12 weeks), and are administered orally

(commonly a once-daily pill) rather than by injections. They have truly revolutionized the way HCV is treated.

36.    Most importantly, 90 to 95% of HCV patients treated with any of these DAA drugs are cured, whereas the old treatment regime was only successful in treating roughly one-third of patients.

37.    For HCV, a "cure" is defined as a sustained virologic response (SVR)— *i.e.*, no detectable HCV genetic material in the patient's blood—for three months following the end of treatment.

38.    In response to the revolutionary DAA medications, the American Association for the Study of Liver Diseases ("AASLD") and the Infectious Disease Society of America ("IDSA") formed a panel of experts to conduct an extensive, evidence-based review of the testing, management, and treatment of HCV. The results of that review have been published in a comprehensive document called the HCV Guidance, which is updated regularly and is available at www.hcvguidelines.org.

39.    The HCV Guidance set forth the medical standard of care for the treatment of HCV, which is well-established in the medical community.

40.    In 2014, the AASLD/IDSA panel, through the HCV Guidance, recommended treatment with DAA drugs for all persons with chronic HCV. The

recommendation reflected the continuing medical research showing the safety, tolerability, efficacy, and dramatic benefits of the DAA drugs.

41.     Treatment with DAA drugs has been the medical standard of care for all patients with chronic HCV since 2014.

42.     Under this standard of care, treatment with DAA drugs is expected to cure nearly all HCV-infected persons.

43.     The benefits of immediate treatment include immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, reduction in the likelihood of the manifestations of cirrhosis and associated complications, a 70% reduction in the risk of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic improvement in quality of life.

44.     Treatment must be provided timely to ensure efficacy. Delay in treatment increases the risk that the treatment will be ineffective.

## Public Health Benefits of Treatment in Prison

45.     Providing expanded HCV screening and DAA treatment in Florida's prisons would greatly reduce the number of new HCV cases in the community. Curing the disease while people are in prison would prevent inmates from transmitting it when released, and testing would diagnose numerous individuals who were unaware they were infected, thus allowing them to seek treatment once released.

46.     Studies have shown that providing DAA treatment to everyone with chronic HCV increases long term cost-savings. One study even found that restricting DAA treatment access until patients were in the later stages of fibrosis actually results in higher per-patient costs because, while it may be initially less expensive to delay administering DAAs, over the course of treatment, the follow-up care outweighs the initial costs.

47.     Thus, early DAA treatment has the potential to both drastically reduce the incidence of HCV in the general population as well as the costs associated with the serious complications caused by untreated HCV, such as liver transplants and liver cancer.

## Defendants Policy and Practice of Not Providing Treatment to Inmates with Chronic HCV

48.     From late-2013, when DAAs first became available, until approximately October 2017, Defendant FDC had a policy and practice of not providing DAA drugs to inmates with chronic HCV.

49.     Defendant FDC enforced such policy and practice despite knowing that the failure to provide DAA drugs to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant FDC has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to Plaintiff's health and the health of thousands of HCV inmates in its custody.

50.    Defendant Geo Group operates private correctional facilities in Florida where it provides healthcare services to inmates housed in its facilities, including Blackwater CF, where Plaintiff was housed from approximately December 2014 to February 2018. Defendant Geo Group has adopted and utilized the same policy and practice of not providing DAA drugs to inmates with HCV as Defendant FDC.

51.    Defendant Geo Group enforced such policy and practice despite knowing that the failure to provide DAA drugs to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Geo Group has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to Plaintiff's health and the health of several other HCV inmates in its prisons.

52.    Defendant Wellpath was Defendant Geo Group's contracted healthcare services provider at Blackwater CF during the times Plaintiff was housed at that facility. Wellpath has adopted and utilized the same policy and practice of not providing DAA drugs to HCV inmates as Defendants FDC and Geo Group.

53.    Defendant Wellpath enforced such policy and practice despite knowing that the failure to provide DAA drugs to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant Wellpath has caused the unnecessary

and wanton infliction of pain and an unreasonable risk of serious damage to Plaintiff's health and the health of several other HCV inmates under its care.

54.     Defendant DMS is charged with managing the contracts between Defendant Geo Group and the State of Florida. More specifically, Defendant DMS is responsible for overseeing and ensuring Defendant Geo Group's compliance with the terms of those contracts, including Geo Group's compliance with FDC's policies and procedures in providing healthcare services to inmates in private prisons, such as Blackwater CF. Defendant DMS has adopted and utilized the same policy and practice of not providing or facilitating the provision of DAA drugs to inmates with HCV as Defendants FDC and Geo Group.

55.     Defendant DMS enforced such policy and practice despite knowing that the failure to provide, or facilitate the provision of, DAA drugs to inmates with HCV subjects those inmates to an unreasonable risk of pain, liver failure, cancer, permanent damage to their health, and even death. By doing so, Defendant DMS has caused the unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to Plaintiff's health and the health of several other HCV inmates housed in prisons operated by Defendant Geo Group.

56.   From late-2013, when DAA drugs first became available, until approximately November 2017, when Defendant FDC was court-ordered[1] to begin treating HCV-infected inmates, the Defendants failed and/or refused to provide or facilitate the provision of DAA drugs to thousands of inmates with HCV in contravention of the prevailing standard of care and with deliberate indifference to the serious medical needs of inmates with chronic HCV in Florida. This policy was implemented because of the cost of the treatment.

57.   As a result of the Defendants' failure and/or refusal to provide necessary medical treatment (*i.e.*, DAA drugs), over 100 inmates died of untreated HCV and hundreds more suffered irreparable liver damage.

58.   Defendants also unjustifiably delayed providing DAA treatment to HCV-infected inmates, even though the standard of care requires treatment as early as possible. Delayed DAA treatment increases the risk that the treatment will be ineffective. If treatment is delayed until a patient develops decompensated cirrhosis, a liver transplant may provide the only cure.

59.   At all times relevant hereto, the Defendants categorically withheld medically necessary treatment from inmates with HCV but did not categorically

---

[1] *See Hoffer v. Jones*, 290 F. Supp. 3d 1292 (N.D. Fla. 2017) (granting preliminary injunction); *Hoffer v. Inch*, 382 F. Supp. 3d 1288 (N.D. Fla. 2019) (granting permanent injunction).

withhold treatment from inmates with other similar diseases or conditions (such as HIV) or from other inmates without similar diseases or conditions.

60.     Defendants had a policy under which inmates with chronic HCV were not provided lifesaving medications for their disability, while inmates with other disabilities had access to lifesaving medications.

61.     Defendants knowingly refused to provide HCV-infected inmates (including Plaintiff) with necessary medical treatment for their serious medical needs and disabilities—and the only treatment regimen recommended under the prevailing standard of care—because of the cost of the treatment.

62.     In short, the Defendants intentionally discriminated against Plaintiff and other HCV-infected inmates on the basis of disability.

## Defendants Deliberately Deprived Plaintiff of Medically Necessary Treatment for His Chronic HCV

63.     Plaintiff has been incarcerated in the Florida prison system since May 4, 2009. Plaintiff has a history of longstanding HCV since at least 2006. At his initial intake health screening in or about May 2009, Plaintiff informed the medical staff at RMC that he had chronic HCV. Thereafter, a hepatitis panel was ordered, which confirmed Plaintiff's diagnosed with HCV. Plaintiff was subsequently enrolled in the Chronic Illness Clinic for monitoring of his HCV.

64.     From the time FDC diagnosed Plaintiff with HCV until January 2018, Plaintiff was only given routine blood draws to loosely monitor his HCV and liver

disease. Critically, Plaintiff was not provided DAAs (once they became available) for his HCV until July 2018 even though treatment with DAAs was required under the standard of care since 2014.

65.   DAA medications were available to Defendants upon request. However, Defendants failed or refused to provide DAA drugs to Plaintiff until July 2018—notably after FDC was sued in federal court in *Hoffer* and ordered to provide DAAs to Plaintiff and thousands of other, HCV-infected inmates.

66.   Whether an FDC inmate receives DAA treatment almost exclusively relies on the inmate's METAVIR or fibrosis score (F0-F4). Under FDC's guidelines, inmates are then prioritized for treatment based on their fibrosis score, which reflects the stage and progression of their liver disease. Nonetheless, until January 2018, Defendants failed to require and otherwise perform the necessary tests to determine the stage and progression of Plaintiff's HCV, and thus, whether Plaintiff truly met the criteria for DAA treatment. In other words, Defendants failed to adequately inform Plaintiff about the severity of his liver disease and the substantial health risks associated with chronic HCV in order to avoid its obligation to offer and provide Plaintiff with medically necessary treatment for his chronic HCV.

67.   It was not until January 2018—more than three years after DAAs became the standard of care for HCV treatment and over a decade after FDC initially diagnosed Plaintiff with HCV—that Plaintiff was given a Fibrosure test to determine

his fibrosis score. The results showed a fibrosis score of F4, thus indicating that Plaintiff had cirrhosis. These results were unsurprising given Plaintiff's longstanding history of chronic HCV, of which the Defendants were all well-aware. Indeed, Plaintiff's liver was cirrhotic well before January 2018, as demonstrated by the fact that Plaintiff's medical records are replete with documentation of his HCV diagnosis and worsening liver function. In fact, when Plaintiff came into FDC's custody in 2009, a copy of his prior medical records were provided to the prison. These prior records indicated that Plaintiff had a diagnostic history of cirrhosis and that Plaintiff was suspected of having encephalopathy as early as 2006.

68.    In particular, Plaintiff's medical records clearly document the fact that Plaintiff suffered from life-threatening cirrhosis of the liver, as well as other countless serious and severe resultant, related, and/or associated medical conditions and effects, including without limitation, lower leg edema, splenomegaly, portal hypertension, esophageal varices, severe fibrosis, chronic liver inflammation, thrombocytopenia, abnormally elevated blood AST and ALT levels, abnormally low blood platelet counts, persistent and extreme fatigue and low energy, increased muscle weakness, joint pain, dizziness, abdominal discomfort and distension, poor appetite, and nausea, beginning or presenting as early as 2014 and persisting throughout his incarceration. Despite Plaintiff's clinical presentation, no DAA treatment was provided to Plaintiff at that time, or in the months and years thereafter.

69.     For years Plaintiff was led to believe that he was on the "list" for HCV treatment. But only a handful of inmates on the list were actually treated prior to the *Hoffer* injunction (*i.e.*, prior to November 2017), and Plaintiff was not one of them. Instead, Defendants repeatedly told Plaintiff he did not meet the treatment criteria under FDC's guidelines, even though Defendants knew that Plaintiff met the AASLD priority criteria for HCV treatment, because the Defendants did not want to pay for Plaintiff's DAA treatment. Treatment was only provided to Plaintiff ***after*** the Court in *Hoffer* ordered FDC to begin providing DAA treatment to HCV-infected inmates. There was no medical reason or justification for the failure to provide Plaintiff with DAAs prior to his ultimate date of treatment.

70.     Throughout his incarceration, Plaintiff repeatedly inquired about the condition of his liver and specifically requested medical treatment for his HCV, both verbally and through the grievance process. All of Plaintiff's requests were denied. In fact, Plaintiff was told that he did not qualify for treatment under FDC's treatment guidelines. Instead, the Defendants merely continued to monitor Plaintiff's HCV from January 2014, when DAAs became the standard of care for treating chronic HCV, until July 2018, when Plaintiff finally received DAA treatment.

71.     Plaintiff repeatedly requested an accommodation for his chronic, serious, severe, and life-threatening HCV—that is, treatment which could result in a cure for his chronic HCV. This request for DAA treatment was a request for a

reasonable accommodation in that DAA drugs are the only recommended form of treatment capable of clearing HCV from Plaintiff's body. Nonetheless, FDC and DMS refused Plaintiff's reasonable request for an accommodation by refusing to treat him with lifesaving and medically-necessary DAA medication.

72.     Plaintiff's request for DAA drugs as treatment for HCV was a reasonable request for a reasonable accommodation, as FDC and DMS are required to provide, or ensure the provision of, such medically necessary medication under both the United States Constitution and the prevailing medical standard of care.

73.     Despite Plaintiff's longstanding HCV-diagnosis, his serious, severe, and life-threatening HCV-related conditions and symptoms, and his repeated requests for treatment, Plaintiff was not provided DAA treatment until July 2018.

74.     Based on Plaintiff's clinical presentation, which is clearly documented in his FDC medical records, Plaintiff should have received DAA treatment as early as 2014 in accordance with the prevailing standard of care. There was no medical justification for Defendants' failure to treat Plaintiff with DAAs at that time, or in the months and years thereafter.

75.     Over the years, Plaintiff liver disease and overall health continued to progress and worsen as a result of the Defendants' refusal to provide HCV treatment.

76.     Plaintiff has suffered and continues to suffer from a variety of symptoms directly caused by or associated with HCV including, but not limited to:

persistent and extreme fatigue and low energy, increased muscle weakness, dizziness, joint pain, abdominal discomfort and distension, poor appetite, and nausea. Some days Plaintiff is unable to muster up enough strength to get out of bed.

77.    Plaintiff has also suffered and continues to suffer from a variety of symptoms or conditions indirectly caused by or associated with HCV including, but not limited to: lower leg edema, splenomegaly, portal hypertension, esophageal varices, severe fibrosis, chronic liver inflammation, thrombocytopenia, abnormally elevated blood AST and ALT levels, and abnormally low blood platelet counts.

78.    Plaintiff was denied DAA treatment for his chronic HCV because Defendants FDC, DMS, Geo Group, and Wellpath had a statewide policy and practice of not providing DAA drugs to HCV inmates. This policy and practice was implemented for non-medical reasons, including, *inter alia*, the cost of the treatment. In other words, Defendants' refusal or failure to provide DAA treatment for non-medical reasons constituted a deliberate indifference towards Plaintiff and his serious medical need and disability.

79.    By being denied access to DAA treatment for his HCV, Plaintiff was denied meaningful access to prison programs, services, and activities, including access to medical services.

80.    The irreparable damage suffered by Plaintiff may have been prevented if not for Defendants' unconstitutional denial and delay of treatment for HCV.

81.    In sum, Plaintiff has suffered and continues to suffer serious, substantial, life-threatening, and permanent injuries, including irreparable liver damage, as a result of the Defendants' refusal or failure to timely provide him necessary medical care and treatment for his chronic HCV.

## COUNT I
## TITLE II OF THE AMERICANS WITH DISABILITIES ACT (ADA)
### (Against Defendants FDC and DMS)

82.    Plaintiff incorporates and re-alleges paragraphs 1 through 81 as if fully set forth herein.

83.    This count is brought under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. 12101, *et seq.* and 42 U.S.C. §§ 12131–12134, and its implementing regulations.

84.    The ADA prohibits public entities from discriminating against individuals with disabilities in their services, programs, and activities. 42 U.S.C. §§ 12131–12134; *see also* 28 C.F.R. §§ 35.130. In other words, the ADA impose an affirmative duty on public entities to create policies and procedures to prevent discrimination based on disability.

85.    Defendants FDC and DMS are "public entities" within the meaning of 42 U.S.C. § 12131(1) and 28 C.F.R. § 35.104.

86.    Plaintiff had chronic HCV, which is a physiological disorder or condition that affects one or more body systems, including but not limited to the

digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems, and is therefore a physical impairment. 42 U.S.C. § 12102(1) & (2); 28 C.F.R. § 35.108(a) & (b). This physical impairment substantially limits one or more major life activities, including but not limited to eating, walking, bending, lifting, concentrating, thinking, and communicating; the operation of major bodily functions such as digestive, gastrointestinal, immune, circulatory, cardiovascular, and hemic systems; and the operation of the liver. 42 U.S.C. § 12102(2); 28 C.F.R. § 35.108(c).

87.    In other words, Plaintiff's chronic HCV caused him to have a disability as defined under the ADA. Stated differently, Plaintiff's disability was chronic HCV.

88.    Plaintiff has a record of having an impairment that substantially limits one or more major life activity, as he has a history of such an impairment. 42 U.S.C. § 12102(1)(B); 28 C.F.R. § 35.108(a)(1)(ii) & (e).

89.    Plaintiff is regarded by FDC and DMS as having an impairment that substantially limits one or more major life activity, as FDC and DMS perceive him as having such an impairment. 42 U.S.C. § 12102(1)(C) & (3); 28 C.F.R. § 35.108(a)(1)(iii) & (f). Defendants FDC and DMS have subjected Plaintiff to a prohibited action because of an actual or perceived physical impairment.

90.    Plaintiff was a qualified individual with a disability because he met the essential eligibility requirements for the receipt of services or the participation in

programs or activities provided by Defendants FDC and DMS, including but not limited to medical services. 42 U.S.C. § 12131(2); 28 C.F.R. § 35.104.

91.    By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendants FDC and DMS excluded Plaintiff from participation in, and denied him the benefits of, services, programs, and activities (such as medical services) offered by FDC and DMS by reason of his disability. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

92.    By withholding medical treatment from those with HCV, but not withholding medical treatment from those with other disabilities or those who are not disabled, Defendants FDC and DMS subjected Plaintiff to discrimination. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(a).

93.    DAAs are the only effective medical treatment available for HCV under the prevailing standard of care, and is the constitutionally-required treatment under the Eighth Amendment. Plaintiff requested DAA treatment for his HCV, which was a request for a reasonable accommodation for his HCV. By failing to request, procure, or provide DAA treatment to Plaintiff, Defendants FDC and DMS refused or failed to provide Plaintiff a reasonable accommodation for his request for treatment of his HCV in violation of Title II of the ADA.

94.     Defendants FDC and DMS failed to provide Plaintiff with equal access to and enjoyment of effective medical services. 28 C.F.R. § 35.130(b)(1).

95.     Defendants FDC and DMS utilized criteria or methods of administration that had the effect of subjecting Plaintiff to discrimination and that defeated or substantially impaired accomplishment of the objectives of medical treatment for HCV. 28 C.F.R. § 35.130(b)(3).

96.     DAAs were readily available to Defendants FDC and DMS during this time period and yet these Defendants categorically refused to provide, or facilitate the provision of, treatment that the medical community deems necessary to treat Plaintiff's chronic HCV.

97.     By failing to request, procure, or provide funding for DAA medications, Defendants FDC and DMS effectively denied and delayed the initiation of necessary medical treatment for Plaintiff's chronic HCV because of the cost of the treatment.

98.     Defendants FDC and DMS knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the rights of Plaintiff. Such violations include but are not limited to:

(a)     FDC and DMS's decision to adopt and enforce a policy and practice of not providing medically necessary treatment to HCV-infected inmates for non-medical reasons, including the cost of the medication;

(b)     FDC and DMS's refusal to ensure the provision of or otherwise provide Plaintiff with necessary medical treatment for his HCV, and the only treatment available under the prevailing standard of care since 2014;

(c)     FDC and DMS's refusal to ensure the provision of or otherwise provide Plaintiff with DAA drugs because of the high, unbudgeted cost of the treatment; and

(d)     To the extent they lacked sufficient funds to purchase DAAs to treat HCV-infected inmates like Plaintiff, FDC and DMS's refusal or failure to even request or procure adequate funding from the Florida Legislature to ensure that Plaintiff (and other HCV-infected inmates) receive medically necessary treatment for his serious medical needs and disability.

99.    Had Defendants FDC and DMS not delayed but instead procured and provided Plaintiff with DAA treatment and the reasonable accommodation he requested throughout his incarceration, Plaintiff would not have suffered additional injuries, including both physical injuries and emotional pain and suffering.

100.   Defendant FDC owed Plaintiff a non-delegable duty to ensure that his wellbeing would not be compromised as a result of discrimination based on his disability. As such, Defendant FDC is vicariously liable for the actions of any and all persons or entities Defendant FDC contracted out its medical services to or otherwise designated to care for Plaintiff.

101.   Defendant DMS is vicariously liable for the policies and practices it enforced in connection with its oversight and management of the private prison contracts with Geo Group, and its knowledge that such policies and practices resulted in a violation of Plaintiff constitutional and federal statutory rights.

102.   As a direct and proximate cause of Defendants FDC and DMS's actions, inactions, omissions and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his ADA rights.

WHEREFORE, Plaintiff demands judgment against Defendants FDC and DMS for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## COUNT II
## SECTION 504 OF THE REHABILITATION ACT (RA)
### (Against Defendants FDC and DMS)

103.   Plaintiff incorporates and re-alleges paragraphs 1 through 81 as if fully set forth herein.

104.   This count is brought under Section 504 of the Rehabilitation Act (RA), 29 U.S.C. § 701, *et seq.* and 29 U.S.C. § 791–794, *et seq.*, and its implementing regulations.

105.   Section 504 of the RA prohibits discrimination against persons with disabilities by any program or activity receiving Federal financial assistance. 29 U.S.C. § 794(a).

106.   Defendants FDC and DMS are each a program or activity receiving federal financial assistance within the meaning of 29 U.S.C. § 794.

107.   Defendants FDC and DMS excluded Plaintiff—a qualified individual with a disability—from participation in, and denied him the benefits of, programs or activities solely by reason of his disability (chronic HCV). 29 U.S.C. § 794(a); 29 U.S.C. § 705(20); 28 C.F.R. § 42.503(a).

108.   Defendants FDC and DMS subjected Plaintiff—a qualified individual with a disability—to discrimination. 29 U.S.C. § 794(a).

109.   Defendants FDC and DMS denied Plaintiff—a qualified handicapped person—the opportunity accorded to others to participate in programs and activities. 28 C.F.R. § 42.503(b)(1).

110. Defendants FDC and DMS utilized criteria or methods of administration that either purposely or in effect discriminate on the basis of handicap, and defeat or substantially impair accomplishment of the objectives of FDC and DMS's programs or activities with respect to handicapped persons. 28 C.F.R. § 42.503(b)(3).

111.   Defendants FDC and DMS knew about the violations described herein but failed to correct them, thereby exhibiting deliberate indifference to the constitutional and federal statutory rights of Plaintiff.

112.   As a direct and proximate cause of Defendants FDC and DMS's exclusion and discrimination, Plaintiff has suffered and continues to suffer from harm and violation of his RA rights.

WHEREFORE, Plaintiff demands judgment against Defendants FDC and DMS for compensatory damages, including for physical injury, disfigurement, permanent physical injury, and emotional pain and suffering, for all prejudgment interest allowable under law, for attorney's fees and costs incurred in connection with this litigation, and for such other relief as this court deems appropriate.

## COUNT III
## 42 U.S.C. § 1983 – EIGHTH AMENDMENT *MONELL* CLAIM
### (Against Defendant Geo Group and Wellpath)

113.   Plaintiff incorporates and re-alleges Paragraphs 1 through 81 as if fully set forth herein.

114.   This count is brought through 42 U.S.C. § 1983 and against Defendants Geo Group and Wellpath for violation of the Eighth Amendment's prohibition of cruel and unusual punishment on inmates.

115.   At all times relevant hereto, Defendants Geo Group and Wellpath and their policymakers knew about and enforced policies, practices, and/or custom that

exhibited deliberated indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment. Defendants Geo Group and Wellpath, acting through their employees and agents, intentionally delayed, failed, and refused to provide Plaintiff with treatment that will address his serious medical needs despite knowing that its actions would result in Plaintiff's continued suffering and exposure to liver failure and its symptoms, liver cancer, and death.

116.   Defendants Geo Group and Wellpath has caused the wanton infliction of pain upon Plaintiff, an HCV-infected inmate, by exhibiting deliberate indifference to his serious medical needs and condition.

117.   The refusal to provide treatment by Defendants Geo Group and Wellpath, acting through their employees and agents, worsened Plaintiff's serious medical condition. Left untreated, Plaintiff's medical needs posed a substantial risk of serious harm, and in fact, did cause actual harm. Defendants Geo Group and Wellpath knew of this substantial risk of serious harm, and the actual harm, faced by Plaintiff, and yet disregarded those risks and harms by failing to provide Plaintiff with the medication that would have alleviated those risks and harms. Thus, Defendants Geo Group and Wellpath has been deliberately indifferent to the substantial risk of serious harm posed to Plaintiff in connection with his HCV.

118.   By denying Plaintiff medically-necessary treatment for his HCV, or unjustifiably delaying in providing such treatment, Defendants Geo Group and

Wellpath imposed punishment far in excess of that authorized by law, contrary to the Eighth Amendment.

119.   Defendants Geo Group and Wellpath's denial and delay of the medically necessary treatment for Plaintiff's HCV violated all standards of decency, contrary to the Eighth Amendment.

120.   Defendants Geo Group and Wellpath's actions with respect to Plaintiff amounted to grossly inadequate care; medical care that can only charitably be described as cursory such that it amounted to no medical care at all.

121.   Defendants Geo Group and Wellpath's refused to provide treatment for Plaintiff's HCV because they had a policy and practice of not providing DAA drugs to HCV patients, which was implemented for non-medical reasons, including the cost of the treatment.

122.   The constitutional violations of Defendants Geo Group and Wellpath, through the actions and omissions of its employees and agents, were directly and proximately caused by policies, practices, and/or customs implemented and enforced by Defendants Geo Group and Wellpath.

123.   As a direct and proximate result of the policies, practices, and deliberate indifference of Defendants Geo Group and Wellpath, Plaintiff has suffered damages, including permanent physical injuries and emotional pain and suffering.

WHEREFORE, Plaintiff demands judgment against Defendants Geo Group and Wellpath for compensatory damages, punitive damages, attorney's fees and costs, and such other relief as this court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all counts alleged above.

Respectfully submitted,

**ANDREWS LAW FIRM**
822 North Monroe Street
Tallahassee, Florida 32303
T: (850) 681-6416 / F: 681-6984

*/s/ John M. Vernaglia*
JOHN M. VERNAGLIA (FBN 1010637)
RYAN J. ANDREWS (FBN 0104703)
DAVID A. WEISZ (FBN 1023229)
john@andrewslaw.com
ryan@andrewslaw.com
david@andrewslaw.com
service@andrewslaw.com
*Counsel for Plaintiff*